UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SAMUEL CASALE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| ECOLAB INC., | ) |
| a Delaware corporation, and | ) |
| | ) |
| NALCO COMPANY LLC, | ) |
| a Delaware corporation, | ) |
| | ) |
| Defendants | ) |

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Samuel Casale, by and through undersigned counsel, hereby complains against Defendants Ecolab Inc. and Nalco Company LLC as follows:

**INTRODUCTION**

1. This is an action for violation of the Federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.; the Federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.; the Maine Whistleblower Protection Act ("MWPA"), 26 M.R.S. § 831 *et seq*.; and the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4571 *et seq*.

2. This case challenges Defendants': (1) interference with Plaintiff's rights and pension benefits under certain employee benefit plans under ERISA; (2) age

1

discrimination against Plaintiff in violation of the ADEA and the MHRA; (3) retaliation against Plaintiff in violation of the MWPA; and (4) violation of the MHRA.

## THE PARTIES

3. Plaintiff Samuel Casale ("Casale") is an individual residing in the Town of Yarmouth, County of Cumberland, and State of Maine.

4. Defendant Ecolab Inc. ("Ecolab") is a Delaware Corporation with a principal place of business in St. Paul, Minnesota, which employed Casale from 2011 to the date of his termination on August 1, 2018.

5. Nalco Company LLC ("Nalco") is a Delaware Corporation with a principal place of business in Naperville, Illinois. From 1995 to the time when Ecolab acquired Nalco in 2011, Plaintiff was continuously employed by Nalco.

6. Ecolab currently has approximately 48,000 employees nationwide.

7. Ecolab is a global provider of water, industrial, and energy technologies. The company's revenue in 2017 exceeded $13.8 billion.

## JURISDICTION AND VENUE

8. Prior to filing this Complaint, Casale filed a charge of discrimination with the Maine Human Rights Commission ("MRHC") and the EEOC. The MHRC dismissed his complaint on February 9, 2021.

9. Venue is proper in this Court because the majority of the discriminatory practices alleged herein occurred in the County of Cumberland and State of Maine.

10. The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## STATEMENT OF FACTS

11. Casale began working as a sales representative for Ecolab in 1995.

12. Over the course of Casale's 24-year career, he received at least 8 different promotions.

13. In 1997, Nalco promoted Casale to the role of Account Manager, where he sold and managed the largest paper account globally, worth $14 million in sales.

14. In 1999, Nalco promoted Casale to Senior Account Manager. In 2000, he advanced further to Area Manager.

15. In 2002, Nalco promoted Casale to District Sales Manager, involving the Maine, New Hampshire, and Vermont territories, worth an annual total of $36 million.

16. In 2006, Nalco promoted Casale to Corporate Account Manager.

17. In 2008, Nalco promoted Casale to Senior Corporate Account Manager, where he was responsible for a portfolio worth more than $60 million.

18. Throughout his employment with Nalco, Casale exceeded all performance benchmarks and had a stellar history of performance.

19. Casale was vested in and a beneficiary of the Nalco Company Retirement Income Plan, a Defined Benefit Pension Plan.

20. In 2009, because of his outstanding performance, Casale received a stock award of $100,000. Casale was the only non-executive employee to receive such an award. Nalco employee Dennis Garbarino, who later became Casale's manager, was resentful of the stock award given to Casale.

21. In 2011, Ecolab acquired Nalco and Casale became an employee of Ecolab. The acquisition did not affect Casale's rights under the Nalco Company Retirement Income Plan.

22. Alternatively, Casale remained an employee of Nalco Company LLC after 2011. For purposes of this Complaint, Casale's employer is referred to alternatively as "Ecolab" or "Defendants."

23. When Ecolab acquired Nalco, employees who were vested in the pension plan became known as "Legacy Nalco" employees, vested and entitled to participate in the "Legacy Nalco" Defined Benefit Pension Plan ("the Legacy Nalco Plan"), as well as Ecolab's pension plan and post-retirement benefits plan.

24. Although Casale was vested in the Legacy Nalco Plan before he even became an employee of Ecolab, the key benchmark for increasing the value of benefits received from the Legacy Nalco Plan was attaining the age of 55. The Legacy Nalco Plan value increased substantially once an employee reached the age of 55. In addition, employees who reached age 55 were considered "grandfathered" into the Ecolab Post Retirement Benefits Plan Health Reimbursement Arrangement, which would provide full health insurance coverage for an employee between the ages of 55 and 65, when Medicare benefits began.

25. Casale planned to work for Ecolab until he reached the age of 62.

26. In 2014, Ecolab gave Casale an overall performance rating of "exceeds expectations." In 2015, his overall rating was: "strong performance."

27. In 2015, Casale left his Key Account Manager role because Ecolab asked him to move over to the mining group of the company.

28. Prior to Casale joining the mining group, multiple older workers were terminated or offered voluntary retirement packages.

29. In early 2017, Ecolab asked Casale to take responsibility for the Peabody Energy account, which was one of the biggest accounts in the coal/mining division. Peabody was facing bankruptcy and Ecolab wanted Casale to initiate and finalize negotiations on a new contract that would help Ecolab avoid a preference claim in the bankruptcy.

30. In the years after Ecolab acquired Nalco, Casale was privy to multiple conversations about eliminating "legacy Nalco" employees over the age of 50 from the company. Ecolab even had a code name for the initiative to target and remove older employees from the company: Project Blue Wave.

31. Project Blue Wave was designed to save the company money by eliminating older workers with higher salaries and long-term incentives, before they attained the age of 55 and became more expensive to the company in terms of pension, healthcare, and post-retirement benefits.

32. As part of Project Blue Wave, Casale's superiors (Dennis Garbarino and Randall Aiken) instructed him to terminate three employees in 2016 who were over the age of 60. These employees were Charles Hutchko (age 67), James Eyth (age 62) and Jack Cranfill (age 67). Each of these older employees were targeted for termination because of their age, tenure, and pension eligibility.

33. Upon information and belief, few if any "Nalco legacy" employees under the age of 40 have been terminated as part of a reduction in force at Ecolab.

34. In early 2017, Casale worked with the highest levels of management and general counsel on finalizing the Peabody contracts. He received positive feedback from general counsel and others for his accomplishments on the difficult negotiation.

35. By April 2017, the Peabody contracts were completed, and Dennis Garbarino remarked: "Great work Sam!" Another email praised Casale's work as follows: "What a great win navigating a complex and competitive process – Great job!"

36. On September 21, 2017, Casale's manager wrote: "Sam, Thank you for lunch and pulling together the Peabody strategy and proposal!"

37. On September 22, 2017, Casale's direct manager Dennis Garbarino's feedback in an email about the Peabody contract was that Casale did an "Awesome!" job. Garbarino thanked Casale.

38. A week later, on September 28, 2017, the Area VP of North America for Global Mining, Daniel Verdejo, emailed Casale: "Excellent job Sam!" regarding the Peabody account. The same day, Richard Lancaster, the District Manager of Northern Mining, wrote: "That is really good stuff, Sam."

39. In December of 2017, Casale received a long-term incentive award for his performance.

40. In early 2018, Casale's direct report Danny Bess received an award for his impressive sales, along with a trip to Hawaii and accolades directly from the COO of Ecolab. Bess was exclusively focused on Appalachian and Illinois basin coal. The

team, managed by Casale, had delivered great results. Bess was Casale's direct report. Part of Casale's responsibilities as a manager was to ensure impressive sales from the people he supervised.

41. On February 14, 2018, Casale emailed his former colleague in the paper division of Nalco Water (a subsidiary of Ecolab) and said he was interested in returning to the paper group. Casale wrote in an email that: "I have discussed this with my Manager in Mining and would like to talk with you about potential opportunities and he is fine with that."

42. On March 1, 2018, Jay Janson (the mining group's Global Corporate Accounts Manager) wrote that the team had "good news to report . . . after grinding it out since last March on a variety of fronts." His email accurately captures some of Casale's many accomplishments in 2017:

> *Sam has very deftly leveraged a mutual relationship he has with the VP of Purchasing, as well as commonality from the Paper Industry. (With a little help from me & Sean as needed) Sam has managed to turn Scott Taylor – Purchasing Manager formerly negative (although cordially so) toward Nalco – into a positive force. After several Defoamer 1010 and Scale Control 101 "classes" with Sam and the aforementioned deft relationship leveraging, Scott is actually making calls on our behalf to their Plant Managers & tech leads to open doors for us to evaluate our products. Until last March, these doors had been repeatedly shut in our faces.*

43. Despite the strong performance that Casale continued to demonstrate in the mining group, in 2017, he received the first negative performance evaluation of his career.

44. James Neissl, one of Casale's peers who had never worked directly with him, and did not supervise him, completed the performance evaluation. Neissl wrote

in the review, which Randall Aiken signed off on, that Casale's performance needed improvement.

45. The comments in Casale's 2017 performance review were clearly false and designed to document reasons to terminate Casale, as an older employee:

> *Sam did demonstrate very good customer relationship skills and has done a good job of helping Janson manage the relationship with Mosaic's US operations to position us for growth in 2018. Sam's direct reports generated new business at targets. Danny Bess implemented price increases at targets. However, the over-all margin decline associated with price concessions to Peabody were so severe that the NA Mining region lost money in Q2, and as a result of the erosion, initiated a lay-off of personnel. Also, attrition from the Peabody Bear Run site was the largest controllable attrition in the Mining SBU. No price captured in 2017 for Jay Janson and Same Casale's accounts. The current business environment for thermal coal producers like Peabody is very difficult and Nalco's financial outcome is not entirely due to Sam's efforts but neither would the management team agree that he effectively mitigated the losses associated with Peabody.*
>
> *Feedback from district managers is that Sam committed to customer meetings but did not show-up or provide any notice he was not available. Experience with Sam by Mining management team was similar in that he was not available for numerous SBU teleconferences related to execution of Pricing and GTW initiates for corporate accounts. This behavior has reduced Sam's effectiveness as a sales team leader.*

46. In reality, Casale never missed a single meeting aside from one occasion when his flight was delayed on a business trip due to weather.

47. The statements contained in Casale's performance review were false, defamatory, pretextual, and designed to fabricate a reason to terminate his employment.

48. Casale responded to the false statements in his review and explained in detail why they were false:

8

> *2017 was a year of significant business challenges, given the cyclical nature of Mining and the coal market, in general. Our largest Mining customer, Peabody, was assigned to me in January 2017. Peabody Energy was emerging from bankruptcy and I was asked by Senior Management to take on the account, and I did so. I had no history with Peabody prior to 2017. I was given the challenge to negotiate three significant contracts, get them assumed and executed . . . all three contracts were successfully negotiated and closed. I have relationships at the Mosaic Company and have been quite engaged. We have significant opportunities with this large, global leader. Our team has worked collaboratively to drive the opportunities in scale control and defoamer. I have high expectations for business growth at Mosaic in 2018.*

49. Casale spoke with HR about his disagreement with the negative performance evaluation, indicating that: "Peabody was emerging from bankruptcy and the preference payment risk outweighed the discount that we needed to provide (the subject of another email). I think our leadership appreciated the results."

50. HR told Casale that an informal investigation would be conducted into his complaints. Casale continued to discuss with HR that he was being unfairly targeted in early 2018. Shortly thereafter, he learned that his 2018 lump sum bonus amount was $0.

51. The short temporal span between Casale complaining to HR and the absence of a bonus payout in 2018 suggests retaliation.

52. On April 4, 2018, Ecolab placed Casale on a bogus Corrective Action Plan with unattainable requirements, which were clearly designed to force him out of the company.

53. On May 31, 2018, Casale reiterated via email that he would be open to other opportunities within Ecolab.

54. In the months and years leading up to Casale's negative performance review, he also complained about his direct manager, Dennis Garbarino, making racist and sexist comments about female colleagues. Specifically, Garbarino referred to a female colleague as a "spic bitch" and became angry when Casale questioned his racist, sexit remark. Garbarino also referred to a colleague of Casale's as "eye candy." When Casale pushed back, Garbarino retaliated against him. When Casale stood up to Garbarino regarding another female colleague, Garbarino retaliated further.

55. In 2018, Casale reported Garbarino's sexist comments in a "Your Voice Matters" survey that Ecolab asks employees to complete. Through a narrow process of elimination, Garbarino was able to decipher that Casale had reported him to HR. Casale also reported in the "Your Voice Matters" survey that the company was engaging in age discrimination.

56. In 2018, but for the bogus performance evaluation and Corrective Action Plan, Casale would have been an outstanding candidate for any other sales role within Ecolab. However, because Ecolab falsely documented performance issues, he was not considered in good standing with the company and not considered for any other positions.

57. In late July of 2018, Ecolab informed Casale that his position was being eliminated, effective August 1, 2018.

58. Casale was 50 years old at the time of his termination from employment.

59. Ecolab provided Casale with false and misleading information about which employees were being considered for this purported reduction in force ("RIF").

60. Ecolab created a false and pretextual performance "matrix," wherein colleagues compared Casale's performance to the other employees who were not selected for the RIF.

61. Ecolab's stated reasons for terminating Casale were pretextual because his sales performance was far stronger than the two employees to whom he was compared, Niessl and Carpenter.

62. Under the ADEA, as amended by the Older Worker's Benefit Protection Act, the information that Ecolab provided to Casale about the "decisional unit" and employees who were and were not selected for the RIF was incomplete and omitted more than a dozen older workers who were selected for termination around the same time, or shortly after, Casale's termination.

63. Upon information and belief, dozens of similarly situated employees like Casale, who were about to attain a larger pension payout upon reaching the age of 55, have been targeted and terminated by Ecolab.

64. If Casale had remained employed with Ecolab until age 55 (2023), his Legacy Nalco Plan lump sum pension amount would have been $615,410. On the date of his termination in 2018, Casale's Legacy Nalco Plan lump sum pension amount was $371,858. This amounts to a difference of $243,552.

65. Casale was also a vested participant in Ecolab's Cash Balance Defined Benefit Pension Plan ("ECB Plan"). If Casale had remained employed with Ecolab until age 55 (2023), his ECB Plan lump sum pension amount would have been

$98,471. On the date of his termination in 2018, Casale's ECB Plan lump sum pension amount was $55,622. This amounts to a difference of $42,849.

66. The full value of Casale's earnings on a yearly basis was approximately $250,000 by 2017.

67. Casale lost earnings in 2018 by being deprived of a bonus.

68. Casale has been unable to find alternative employment since his termination, including positions he has applied for at Ecolab and/or Nalco. In addition, if Casale had been fully vested in the pension plan by remaining employed until age 55, the plan would have entitled him to full health care coverage for life.

69. Ecolab's agents and representatives knowingly and willfully retaliated and discriminated against Casale in violation of State and Federal law.

## COUNT I – ERISA § 510 INTERFERENCE
## (29 U.S.C. § 1140)

70. Plaintiff repeats the allegations contained in Paragraphs 1 through 69 as if fully stated herein.

71. ERISA § 510 provides that: "It shall be unlawful for any person" to "discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act."

72. Casale was entitled to benefits under both the Legacy Nalco Plan and the ECB Plan as an employee of Ecolab and he met all requirements for participation under the terms of each Plan.

73. Each of the Plans described above amounted to employee welfare/benefit plans under ERISA.

74. Casale was fully vested in each Plan, although his entitlement to benefits was significantly reduced by Ecolab's discriminatory firing before he attained the age of 55.

75. Defendants' termination of Casale's employment was undertaken with specific intent and for the direct purpose of depriving him of employee benefits to which he would have otherwise been entitled.

76. Defendants' discriminatory termination of Casale's employment was motivated by a desire to limit the amount of Plan funds to which he was entitled. As such, interference with Casale's benefits under each Plan was a motivating factor behind his termination.

77. Administrative exhaustion of Casale's ERISA interference claim is not necessary under the circumstances of this case, where an appeal process to the employer that discriminated against him and terminated his employment in violation of ERISA § 510, would have been futile.

78. The terms of the Plans do not include a remedy for, or an appeal process related to, the company terminating employment out of a desire to reduce the amount of a vested employee's future pension plan benefits.

79. Defendants' stated reasons for terminating Casale's employment, either as part of a reduction in force or for performance reasons, were mere pretext for discrimination as set forth above.

WHEREFORE, Plaintiff Samuel Casale requests that the Court enter judgment in his favor and against Defendants and award him all equitable, statutory, and compensatory damages available under ERISA § 510, along with attorney's fees, costs and expenses, and all other relief afforded by law.

### COUNT II – AGE DISCRIMINATION
### IN VIOLATION OF THE ADEA, DISPARATE TREATMENT
### (29 U.S.C. § 621 *et seq.*)

80. Plaintiff repeats the allegations contained in Paragraphs 1 through 79 as if fully stated herein.

81. Casale is a member of a protected class based on his age at the time of termination (50).

82. Ecolab's criticism of Casale's performance, and the eventual termination of his employment, was in fact pretext for age discrimination.

83. Defendants took adverse employment action against Plaintiff as a direct and proximate result of his age.

84. Defendants showed discriminatory bias toward older workers by retaining similarly situated younger employees who were less qualified than Plaintiff.

85. Defendants showed discriminatory bias toward older workers by favoring younger workers compared to older workers like Plaintiff.

86. In pursuing a purported reduction in force, Ecolab did not treat age neutrally but instead selected employees for termination in a manner that showed a preference for younger workers.

87. Unlawful age discrimination has taken place within the meaning of the ADEA.

88. Defendants discriminated against Plaintiff on the basis of age knowingly or with reckless disregard for whether its conduct was prohibited by the ADEA. Because Defendants' discrimination was willful, Casale is entitled to liquidated damages of twice the amount of his lost wages.

89. As a result of Defendants' discriminatory actions, Casale has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Samuel Casale requests that the Court enter judgment in his favor and against Defendants and award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded by law.

### COUNT III – AGE DISCRIMINATION IN VIOLATION OF THE ADEA, DISPARATE IMPACT
**(29 U.S.C. § 621 *et seq.*)**

90. Plaintiff repeats the allegations contained in Paragraphs 1 through 89 as if fully stated herein.

91. Casale is a member of a protected class based on his age at the time of termination (50).

92. The selection criteria utilized by Ecolab for determining who to retain and who to terminate in the 2018 RIF were chosen and implemented in such a way to create an employment policy that disparately impacted older workers who were close to but not yet over the target age of 55.

93. The discriminatory selection criteria used by Ecolab for determining who to retain and who to terminate in the RIF caused multiple older workers to lose their jobs and/or be replaced by younger, less experienced workers.

94. Casale and his similarly situated employees over the age of 40, but under the age of 55, have been discriminated against by Defendants in their efforts to systematically remove older workers from the company.

95. Additionally, Defendants have terminated the employment of older workers who had already attained the age of 55 and vested into the Nalco Legacy Plan, in an attempt to cover up or distract from the illegal employment practices described herein.

96. As a result of Defendants' discriminatory actions, Casale has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Samuel Casale requests that the Court enter judgment in his favor and against Defendants and award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive

damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded by law.

## COUNT IV – VIOLATION OF THE MAINE WHISTLEBLOWER PROTECTION ACT
**(26 M.R.S. § 831 *et seq.*)**

97. Plaintiff repeats the allegations contained in Paragraphs 1 through 96 of his Complaint as if fully set forth herein.

98. Casale engaged in protected activity within the meaning of the Maine Whistleblower Protection Act ("MWPA") by making protected whistleblower complaints to Defendants on more than one occasion.

99. Casale had a reasonable, good faith basis for believing his report to Defendants of illegal conduct on the part of his manager, as well as age discrimination within the company, violated Maine and Federal law.

100. Casale engaged in the aforementioned protected activity in good faith.

101. The aforementioned instance(s) of protected conduct bear a causal relationship to the adverse employment action(s) alleged herein.

102. As a result of Defendants' whistleblower retaliation, Casale has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Samuel Casale requests that the Court enter judgment in his favor and against Defendants and award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive

damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded by law.

### COUNT V – VIOLATION OF THE MAINE HUMAN RIGHTS ACT
**(5 M.R.S. § 4571 *et seq*.)**

103. Plaintiff repeats the allegations contained in Paragraphs 1 through 102 as if fully stated herein.

104. For all of the reasons set forth in Counts II through IV above, unlawful discrimination and retaliation against Plaintiff have taken place within the meaning of the Maine Human Rights Act.

WHEREFORE, Plaintiff Samuel Casale requests that the Court enter judgment in his favor and against Defendants and award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded by law.

### JURY TRIAL DEMAND

Plaintiff Samuel Casale hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated: May 10, 2021                    */s/ Laura H. White*

_____
Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*lwhite@whiteandquinlan.com*


/s/ *Danielle Quinlan*

_____
Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*dquinlan@whiteandquinlan.com*