# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| SAMUEL CASALE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 2:21-cv-00126-NT |
| | ) |
| ECOLAB INC., et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

Before me is the Defendants' motion to compel arbitration and to dismiss or stay the Complaint ("**Defs.' Mot.**") (ECF No. 15). For the reasons stated below, the motion is **GRANTED**.

## BACKGROUND[1]

From 1995 until 2011, Plaintiff Samuel Casale worked in sales for Defendant Nalco Company LLC ("**Nalco**"). Compl. ¶¶ 5, 11–17 (ECF No. 1). Mr. Casale was a beneficiary of, and was vested in, the Nalco Company Retirement Income Plan. Compl. ¶ 19. In 2011, Defendant Ecolab, Inc. ("**Ecolab**") acquired Nalco. Compl. ¶ 21.

---

[1] "[T]he record for purposes of resolving a motion to compel arbitration generally includes the complaint and the record materials submitted in support of or opposition to the motion." *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 171 n.1 (1st Cir. 2021). In addition to the Complaint, the record here consists of four pieces of evidence submitted by the Defendants: a declaration by someone from the human resources department at Ecolab, Inc. ("**Ecolab**"); an email sent to Ecolab employees notifying them that they were required to sign an arbitration agreement; a newsletter informing employees of the same; a slideshow explaining the arbitration program; and an email purportedly confirming that Mr. Casale had signed the Arbitration Agreement. Decl. of Stefanie Cossalter Motley ("**Motley Decl.**"); Motley Decl. Exs. A–D (ECF Nos. 15-1, 16). The Plaintiff has not submitted any evidence for my consideration. In evaluating the factual record, I construe it "in the light most favorable to" the Plaintiff "and draw all reasonable inferences in [his] favor." *Air-Con*, 21 F.4th at 175.

After this acquisition, Mr. Casale was entitled to participate in two different pension plans, the Legacy Nalco Defined Benefit Pension Plan (the "**Legacy Nalco Plan**") and Ecolab's Cash Balance Defined Benefit Pension Plan (the "**ECB Plan**") (collectively, the "**Plans**"). Compl. ¶¶ 23, 65. Although Mr. Casale's interest in the Legacy Nalco Plan had already vested, his benefits were set to increase substantially upon reaching the age of fifty-five. Compl. ¶ 24. In 2018, when Mr. Casale was fifty years old, Ecolab notified him that his position was being eliminated. Compl. ¶¶ 57–58.

After his termination, Mr. Casale sued the Defendants for age discrimination (Counts II and III), a violation of the Maine Whistleblower Protection Act (Count IV), a violation of the Maine Human Rights Act (Count V), and, most relevant to this opinion, a violation of the Employee Retirement Income Security Act of 1974 ("**ERISA**") (Count I). Compl. 12–18. With respect to the ERISA count specifically, Mr. Casale alleges that the Defendants fired him in order to deprive him of his benefits to which he was entitled under the Plans, in violation of ERISA § 510. Compl. ¶¶ 71–79.

After Mr. Casale filed his Complaint, the Defendants moved to compel arbitration and to dismiss or stay this case, arguing that Mr. Casale had previously agreed to arbitrate the claims in the Complaint. Defs.' Mot. 12. In support of their argument, the Defendants principally rely on a declaration submitted by Stefanie Cossalter Motley (the "**Motley Declaration**"), a human resources representative from Ecolab's Employee Relations and Compliance department. Motley Decl. ¶ 3. Mr.

2

Casale has not introduced any evidence and has made no effort to rebut any of what Ms. Motley offers. He only challenges the basis for some of her conclusions and seeks to identify purported holes in the information she has provided. *See* Pl.'s Opp'n to Defs.' Mot. ("**Pl.'s Opp'n**") 1–4 (ECF No. 19). As a result, to the extent Ms. Motley's conclusions are accurately supported, I accept them as true.

On October 3, 2014, Ecolab notified its employees that it was implementing a new dispute resolution program and that, as a part of this program, all employees were required to sign a Mediation and Arbitration Agreement (the "**Arbitration Agreement**") by October 22, 2014. Motley Decl. ¶¶ 6, 10. The email included a link to a newsletter, a copy of which was also mailed to employees' homes. Motley Decl. ¶ 11; Motley Decl. Ex. A (ECF No. 15-1, at 8).

This newsletter notified Ecolab employees that they were required to use mediation and/or arbitration to resolve all legal disputes against Ecolab and that they were required to sign the Arbitration Agreement by October 22, 2014, as a condition of continued employment. Motley Decl. Ex. B ("**Ex. B**"), at 1, 4 (ECF No. 15-1, at 10–17). That is, employees were notified that a choice not to sign the Arbitration Agreement was a choice "to end [their] employment with Ecolab." Ex. B, at 4.

Employees subsequently received an email containing a unique link through which each employee could access a training module explaining the new program. Motley Decl. ¶ 12. That training module allowed each recipient to read and electronically sign the Arbitration Agreement. Motley Decl. ¶ 12.

3

Employees who received this email could access the training module by logging into their email accounts using their own unique password that they were required to change regularly. Motley Decl. ¶ 12. After clicking on his/her unique link to the training module, each recipient was required to confirm his/her identity by entering the last five digits of his/her employee identification number. Motley Decl. ¶ 13.

Slide 13 of the training module informed employees that if they did not sign the Arbitration Agreement, they would be "choosing to end [their] employment with Ecolab." Motley Decl. Ex. C ("**Ex. C**"), at 11 (ECF No. 15-1, at 19–41). Slide 14 notified employees that they were required to read and electronically sign two documents—first, a document indicating the employee's consent to proceed electronically (the "**Electronic Authorization Document**") and second, the Arbitration Agreement. Ex. C, at 11. That same slide also notified employees that if they did not sign the Electronic Authorization Document, the training module would end and the employee would be required to make arrangements with their manager or human resources to sign a hard copy of the Arbitration Agreement prior to the October 22 deadline. Ex. C, at 12; Motley Decl. ¶ 18. The slide then provided a link to the Electronic Authorization Document, which notified employees that signing the Electronic Authorization Document required the employee to use his/her password and that it indicated the employee's consent to signing the Arbitration Agreement electronically. Ex. C, at 12–14.

Once an employee signed the Electronic Authorization Document and agreed to proceed electronically, the employee could proceed to Slide 15, which invited the

4

employee to read the Arbitration Agreement. Motley Decl. ¶ 19; Ex. C, at 16. Slide 16 again invited the employee to read the Arbitration Agreement and also instructed the employee to sign the agreement, through which he/she agreed to having read and understood, and to accept the terms of, the Arbitration Agreement. Ex. C, at 17, 22; Motley Decl. ¶¶ 21–22.

Employees who signed the Arbitration Agreement automatically received a system-generated email confirming that they had signed it. Motley Decl. ¶ 24. That email confirmed that the employee "ha[d] entered into" the Arbitration Agreement and provided a copy of the substance of that agreement. Motley Decl. Ex. D ("**Ex. D**") (ECF No. 16). This confirmation email was sent to Mr. Casale's email account on October 17, 2014, at 7:57am. Motley Decl. ¶¶ 12, 25, Ex. D. Ms. Motley contends that this email "would not have been sent to [Mr. Casale] unless he had electronically signed the Arbitration Agreement." Motley Decl. ¶ 25.

The Arbitration Agreement outlines that it applies to "Disputes," which the agreement broadly defines. Ex. C, at 18. But there are some claims that are excluded from this definition, including, as relevant here, claims related to "controversies over awards of benefits or incentives under [Ecolab's] stock option plans, employee benefits plans or welfare plans that contain an appeal procedure or other procedure for the resolution of such controversies." Ex. C, at 18.

## STANDARD OF REVIEW

Motions to compel arbitration are evaluated in the same fashion as motions for summary judgment. *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168,

175 (1st Cir. 2021). The reviewing court considers all of the evidentiary materials before it and, construing the record in the light most favorable to the non-movant, determines whether a genuine dispute of fact exists regarding whether the parties agreed to arbitrate. *Id.* at 176. If a genuine dispute exists, the court convenes a hearing to "resolve[ ] any factual disputes that require resolution before it can be determined whether the parties agreed to arbitrate." *Id.* The burden to prove a valid arbitration agreement rests with the moving party. *Id.* at 173. But if the party moving to compel arbitration meets its initial burden of production, the non-moving party must offer evidence supporting its own case. *Id.* at 177. "[T]he party opposing arbitration [must] provide prompt notice of 'whatever claims [he/she] may have in opposition to arbitration and the evidentiary basis of such claims.' " *Id.* at 175 (quoting *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)). He/she "cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests" but instead "must identify specific evidence in the record demonstrating a material factual dispute" left to be adjudicated. *Id.* at 175 n.8 (quoting *Soto v. State Indus. Prods., Inc.*, 642 F.3d 67, 72 n.2 (1st Cir. 2011)). Only "[i]f the non-moving party puts forward materials that create a genuine issue of fact about a dispute's arbitrability" should the district court convene a "trial to resolve that question." *Id.* at 175.

## DISCUSSION

The Federal Arbitration Act ("**FAA**") "reflects Congress's intent to create a 'liberal federal policy favoring arbitration.' " *Id.* at 173 (quoting *AT&T Mobility*

6

*LLC* v. *Concepcion*, 563 U.S. 333, 346 (2011)). And "questions of arbitrability must be addressed with a healthy regard for th[is] federal policy." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "In passing the FAA, Congress sought to 'place arbitration agreements upon the same footing as other contracts.'" *Air-Con*, 21 F.4th at 173–74 (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)). As a result, arbitration agreements are to be treated the same as other contracts and enforced "according to their terms." *Id.* at 174 (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019)).

"The party seeking to compel arbitration bears the burden of demonstrating" four things: "that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Id.* (quoting *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011)). The Plaintiff challenges the validity of the Arbitration Agreement itself and, as a secondary argument, whether the ERISA claim falls within the scope of the agreement.

## I.   Validity of the Arbitration Agreement

The validity of an arbitration agreement is scrutinized through the lens of state contract law. *Id.* Accordingly, "courts can invalidate arbitration agreements only on the same 'generally applicable contract defense' grounds that would apply to all other contracts." *Rivera-Colón v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 207 (1st Cir. 2019) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

The Defendants have not presented a copy of the Arbitration Agreement bearing Mr. Casale's signature, but they have presented strong circumstantial evidence that he did electronically sign that document. That is, they have demonstrated a chain of events that they say could not have been set in motion if he had not signed the Electronic Authorization Document and the Arbitration Agreement.

The Plaintiff takes issue with the fact that the Defendants rely on circumstantial evidence rather than direct evidence such as an Arbitration Agreement bearing Mr. Casale's signature. Pl.'s Opp'n 2–3. But the Plaintiff cites to no authority to support the idea that reliance on circumstantial evidence is impermissible, presumably because there is no such authority.[2] *See Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 46 n.9 (1st. Cir. 2009) ("[C]ircumstantial evidence is not necessarily less probative than direct evidence."). The Defendants have put forward evidence that Mr. Casale would not have been sent the confirmation email if he had not electronically assented to the Arbitration Agreement, and the Plaintiff offers no evidence to demonstrate that this assertion is untrue.[3]

---

[2] I take the Plaintiff's point that it would have been helpful for the Defendants if they had presented an Arbitration Agreement with Mr. Casale's electronic signature. And it is reasonable to infer from the fact that they have not done so that such a document does not exist. But even assuming that to be true, it does not follow that Mr. Casale never signed the Arbitration Agreement. There are legitimate explanations for why that document might not exist, including that the Defendants' computer system may never have kept a record of such a signature. If the Plaintiff had presented evidence to rebut what the Defendants have offered, the Defendants may have had to add more weight to their side of the evidentiary scale in order to meet their burden. But here, the Plaintiff's side of the scale is empty.

[3] Equally unavailing is the Plaintiff's argument with respect to the final slide in the training module. The Plaintiff contends that this "is a signature template that was obviously intended by Ecolab to be collected from employees who had agreed to be bound by the [A]rbitration [A]greement." Pl.'s Opp'n to Defs.' Mot. to Compel Arbitration ("**Pl.'s Opp'n**") 4 (ECF No. 19). This is not "obvious[ ],"

8

Instead, the Plaintiff argues that there is insufficient foundation for the information in the Motley Declaration. But in doing so he relies on nothing more than assumptions. The Plaintiff points out that the Motley Declaration does not say whether Ms. Motley was employed by Ecolab in 2014 or whether she is knowledgeable about the technological aspects of how Ecolab obtained, tracked, and stored its employees' signatures for the Arbitration Agreement. Pl.'s Opp'n 2–4. So the Plaintiff appears to assume that Ms. Motley lacks such knowledge and that the Motley Declaration must be "predominantly comprised of hearsay." Pl.'s Opp'n 2–4. The problem with this line of argument is that it ignores that the Motley Declaration explicitly says that it is based on Ms. Motley's personal knowledge and that she is "familiar with Ecolab's practices with respect to employee agreements, specifically including arbitration agreements." Motley Decl. ¶¶ 2–3. Given that Ms. Motley works as a human resources representative at Ecolab and that Ecolab's human resources employees were trained in the rollout of Ecolab's new arbitration program, Motley Decl. ¶¶ 3, 8, it is not at all surprising that Ms. Motley is knowledgeable about the matters discussed in her declaration.

The Plaintiff also tries to discredit the confirmation email that is the crux of the Defendants' motion. In particular, the Plaintiff says that this email is not to be taken for what it purports to be because it "could have been drafted by anyone and

---

and it is an assumption that does not appear to be true. There is a button on the slide that says: "Click to print and sign for *your* [i.e., the employee's] records." Motley Decl. Ex. C, at 23 (ECF No. 15-1, at 19–41) (emphasis added). And Ms. Motley has confirmed that the employee could use that button to "generate a certificate that the employee could sign and keep in his or her records," Motley Decl. ¶ 26, not Ecolab's.

9

then sent from" the "HR Communications" email address.[4] Pl.'s Opp'n 3. But this is nothing more than rank speculation; the Plaintiff has no evidence to support the idea that this email may have been fabricated.

Given that it is the Defendants' burden to prove the validity of the Arbitration Agreement, the Plaintiff's attempts to counter the Defendants' motion merely by identifying purported flaws in the Defendants' evidence could theoretically be successful. But here those attempts do not succeed, since the holes that the Plaintiff identifies are either nonexistent or inconsequential. In order to rebut the Defendants' evidence, the Plaintiff "must identify specific evidence in the record demonstrating a material factual dispute." *Air-Con*, 21 F.4th at 175 n.8 (quoting *Soto*, 642 F.3d at 72). But rather than rely on "specific evidence in the record," the Plaintiff relies only on assumptions and speculation. Importantly, the Plaintiff never identifies any specific evidence that could call into question any of the key contentions for which the Defendants have supporting evidence—namely, that the confirmation email would not have been sent to his email account if he had not electronically signed the Arbitration Agreement; that he could not have signed the Arbitration Agreement without agreeing to the Electronic Authorization Document; that he could not have signed the Electronic Authorization Document without using his password; and that he could not have accessed the training module containing either of these documents

---

[4] The Plaintiff also points out that there is a mysterious date at the bottom of the page of the confirmation email that differs from the date the Defendants contend the email was sent. Pl.'s Opp'n. 4. But the Plaintiff offers no reason why that should call into question the Defendants' evidence. The email says it was sent on the day the Defendants say it was. The date at the bottom (assuming it even is a date) could mean any number of things, such as the date the email was printed or saved.

without entering the last five digits of his employee identification number after clicking on the unique link sent to his email account.

In an effort to bolster his position, the Plaintiff leans heavily on two First Circuit cases that he says demonstrate the inadequacy of the procedure that the Defendants used here in creating an enforceable arbitration agreement. Pl.'s Opp'n 6–7. But both cases are factually distinct. In the first, *Campbell v. General Dynamics Government Systems Corp.*, the defendant employer emailed its employees about its implementation of a new dispute resolution policy and in the email provided links to the full policy and to a brochure notifying employees that their continued employment after the policy's effective date would constitute consent to the new policy. 407 F.3d 546, 547–48 (1st Cir. 2005). But while the defendant had a record of the plaintiff opening that email, it lacked a record of who clicked on the embedded links, and the plaintiff (unlike Mr. Casale) contended that he never did so. *Id.* at 548–49.[5]

---

[5] *Campbell* was about whether an employee had received "sufficient notice" of the scope of an arbitration agreement, not the validity of the agreement itself. *Rivera-Colón v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 215 (1st Cir. 2019). But the Plaintiff here does not challenge the notice that he received. *Campbell*'s discussion of what constitutes sufficient notice is also not helpful to the Plaintiff's more general claim challenging the validity of the use of an electronic process to sign an arbitration agreement. The First Circuit made clear that "an e-mail, properly couched, [could] be an appropriate medium for forming an arbitration agreement" and that it was "eas[y]" to "envision circumstances in which a straightforward e-mail, explicitly delineating an arbitration agreement, would be appropriate." *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 555–56 (1st Cir. 2005). The *Campbell* court found there to be insufficient notice based on how the particular employer in that case had notified its employees of its new dispute resolution policy, but it also found it to be a "close case" that was "tied to its specific facts." *See id.* at 557, 559. Here, unlike in *Campbell*, the Defendants have produced evidence that the Plaintiff did receive notice of the contents of the Arbitration Agreement; it has produced an email that not only contains that information, but that the Defendants say (without any evidence to the contrary) could only have been sent to the Plaintiff after signing the Arbitration Agreement and thereby acknowledging he had read its contents.

11

The Plaintiff next analogizes his case to *National Federation of the Blind v. The Container Store, Inc.* Pl.'s Opp'n 6–7. But that case, too, is inapposite. *National Federation of the Blind* involved blind customers who had enrolled in a store loyalty program that had a mandatory arbitration provision as a part of its terms and conditions. 904 F.3d 70, 75–76 (1st Cir. 2018). However, that arbitration provision was disclosed on the stores' point-of-sale visual touch screen interfaces, which lacked tactile keypads, so the existence of the arbitration agreement was never communicated to the plaintiffs. *Id.* at 75–76, 83. As a result, the plaintiffs denied having been aware of the terms and conditions of the loyalty program, and the defendant produced no evidence to contradict these denials. *Id.* at 83. Conspicuously missing from the case before me—as was present in *Campbell* and *National Federation of the Blind*—is any denial by the Plaintiff that he signed the Arbitration Agreement or that he was unaware that he was entering into an agreement to arbitrate.

The Plaintiff's final argument relies on the idea that an electronic signature on an arbitration agreement is only valid "when there is proof that an employee entered her own unique password in order to generate that electronic signature," Pl.'s Opp'n 7, citing two out-of-circuit district court cases for that proposition. Neither case does support that proposition. Those cases focus on the idea that entering a password is sufficient evidence of an electronic signature,[6] but that does not mean that failing to

---

[6] In one, although the plaintiff had to enter her password before electronically signing the arbitration agreement, the court never indicated that that fact was dispositive. *See Barrows v. Brinker Rest. Corp.*, 5:19-cv-144 (GLS/ATB), 2021 WL 638271, at *2 (N.D.N.Y. Feb. 18, 2021). Moreover, as in *Campbell* and *National Federation of the Blind*, the plaintiff in *Barrows* actually disputed having

12

enter a password is necessarily *insufficient*. Moreover, while the Plaintiff did not need to enter his password immediately prior to signing the Arbitration Agreement, the Defendants' evidence shows that he could not have accessed the Arbitration Agreement without entering his password or employee identification number at least three times. He had to log into his email using his password to access the training module. After clicking on the link to the training module in the email that was sent to him, he had to enter the last five digits of his employee identification number in order to access the module. And he had to enter his password in order to sign the Electronic Authorization Document.

Although the Plaintiff argues that the Defendants "have done nothing to prove that Casale actually went through the process of electronically signing anything," Pl.'s Opp'n 7, he is wrong. The Defendants have offered evidence that establishes a chain of events that occurred whereby the Plaintiff received notice of the Arbitration Agreement and assented to it. The Plaintiff offers no evidence in response and thus there is no genuine dispute of fact on this issue. Accordingly, I conclude that a valid arbitration agreement exists, which the Defendants may invoke and which binds the

---

electronically signed the document. *Id.* at *3. Even still, the plaintiff failed to present any evidence to support her denial, and the court found that her mere denial did not create a genuine issue of material fact in light of the strong circumstantial evidence supporting the validity of her electronic signature. *Id.*

Similarly, in the second case, the court never indicated that an electronic signature could only be valid if it was created through the entry of a password—rather, it disregarded the plaintiff's argument that the use of a password to create an electronic signature was necessarily *insufficient*. *See Smith v. Rent-A-Center, Inc.*, 1:18-CV-01351 LJO JLT, 2019 WL 1294443, at *3, *6 (E.D. Cal. Mar. 21, 2019).

13

Plaintiff. The remaining question is whether the Plaintiff's claims fall within the Arbitration Agreement's scope.

## II. Scope of the Arbitration Agreement

The Arbitration Agreement excludes from its scope "claims related to . . . controversies over awards of benefits or incentives under [Ecolab's] stock option plans, employee benefits plans or welfare plans that contain an appeal procedure or other procedure for the resolution of such controversies" (the "**exclusionary clause**"). Ex. C, at 18. The Plaintiff contends that because the Plans have appeals procedures no claims arising under the Plans (i.e., any ERISA claim) can fall within the Arbitration Agreement's scope. The Defendants argue that all ERISA claims that do not have an administrative appeal procedure are covered by the Arbitration Agreement and that because there was no appeal procedure available for the Plaintiff's ERISA § 510 claim, it must be sent to arbitration with the other claims. The Plaintiff concedes that his specific claim does not have an appeal procedure, but he contends that because the Plans themselves do, his claim still falls within the exclusionary clause. Compl. ¶ 78; Pl.'s Opp'n 8.

In evaluating the scope of an arbitration agreement, courts generally look to state contract law. *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 376 (1st Cir. 2011). However, courts also must give due regard "to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration." *Id.* (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)); *Moses H. Cone*, 460 U.S. at 24–25

14

("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .").[7]

Because the exclusionary clause by its explicit terms only applies where there is an appeal procedure for "such controversies" rather than controversies in general, I understand this clause to mean that the Arbitration Agreement does not apply to claims involving an Ecolab stock option, employee benefits, or welfare plan that contains an appeal procedure (or other procedure for resolution) for *that particular* controversy. In the context of this case, that means that the Plaintiff's ERISA claim is arbitrable so long as neither of the Plans contains an appeal procedure for that claim.

The Plaintiff disagrees with this interpretation. He argues that, at the very least, it is plausible to interpret the exclusionary clause to mean that "*any controversy* over an employee benefit plan or welfare plan that includes an administrative appeal procedure" falls within the exclusionary clause. Pl.'s Opp'n 10. He then argues that

---

[7] The Plaintiff does not challenge the application of this federal policy but rather invokes *Gove v. Career Systems Development Corp.*, 689 F.3d 1 (1st Cir. 2012), to argue that, under Maine law, where an arbitration agreement is ambiguous, the principle that ambiguity is construed against the drafter trumps the canon that ambiguities in the scope of an arbitration clause are read in favor of arbitration. Pl.'s Opp'n 9. But the Plaintiff misreads *Gove*. In that case, the First Circuit acknowledged that "in evaluating the scope of an arbitration agreement," a court "[n]ormally . . . would give significant weight to the federal policy favoring arbitration and the presumption of arbitrability." 689 F.3d at 5. But in *Gove*, the defendant had not relied on that federal policy, instead relying entirely on Maine law. *Id.* The court thus considered any argument that that federal policy should control to have been waived. *Id.* It is only because the defendant had waived the argument that the First Circuit looked to Maine law about ambiguities in a contract instead of the federal policy favoring arbitration. *Id.* at 6 ("Because [the defendant] has not relied on federal law or explained the interaction of the federal policy favoring arbitration with Maine contract law, we will not consider arguments based on the federal policy that it chose not to make."). This case is starkly different. The Defendants did invoke that federal policy and have argued specifically that any doubts concerning the scope of an arbitration agreement are resolved in favor of arbitration. Defs.' Mot. to Compel Arbitration & Dismiss or in the Alternative Stay Pl.'s Compl. ("**Defs.' Mot.**") 7, 9 (ECF No. 15); Defs.' Reply in Supp. of Defs.' Mot. 5 (ECF No. 22). As a result, that policy plays its "[n]ormal[ ]" significant role here, and I do not look to Maine law.

this ambiguity is construed against the drafter (Ecolab), so his ERISA claim is not arbitrable so long as the Plans contain any sort of appeal procedure, even if there is not one for his particular ERISA claim. Pl.'s Opp'n 9–10.

I disagree that the Plaintiff's interpretation is a plausible one. If the Plaintiff's interpretation were correct, it would mean that *all* ERISA controversies would be excluded from arbitration. This would render superfluous the exclusionary clause's restriction to "such controversies" with an appeal procedure, and the Plaintiff offers no explanation for the purpose of the "of such controversies" clause that does not render it superfluous. It is illogical to read the exclusionary clause in a way that not only renders it ambiguous, but also creates superfluity. *Cf. Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) (noting that the rule against surplusage is disfavored where it creates ambiguity). The fact that the Plaintiff can conceive of some potential interpretation of the exclusionary clause that favors him does not make the statement ambiguous. "Statutory language is considered ambiguous if it is *reasonably* susceptible to different interpretations." *Mundell v. Acadia Hosp. Corp.*, 1:21-cv-00004-LEW, 2022 WL 375832, at *3 (D. Me. Feb. 8, 2022) (quoting *Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, ¶ 14, 157 A.3d 223). And the Plaintiff's interpretation is not a reasonable one.

In addition, even if I were to find the exclusionary clause to be ambiguous, that still would not tip this case in the Plaintiff's favor. As explained above, the federal policy favoring arbitration requires doubts to be resolved in favor of arbitration. As a

16

result, even assuming the exclusionary clause were ambiguous, here, that ambiguity would be resolved in favor of the Defendants.

Based on this analysis, the Plaintiff's ERISA claim is only arbitrable if that particular type of claim contains an appeal procedure. But the Plaintiff has already conceded that it does not. Compl. ¶ 78; Pl.'s Opp'n 8. The Plaintiff's ERISA claim thus does not fall within the exclusionary clause, and it is subject to the Arbitration Agreement.

Where a plaintiff seeks to assert claims subject to arbitration, a court may stay the case pending arbitration. *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 156 n.21 (1st Cir. 1998). But where all of the plaintiff's claims are subject to arbitration (as here), dismissal is also appropriate. *Id.* Because all of the Plaintiff's claims are subject to the Arbitration Agreement, dismissing this case is the prudent course of action.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendants' motion to compel arbitration and **DISMISSES** this case.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 14th day of February, 2022.

17